UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 DEC 28   AM 10: 52

CLERK

BY _____
DEPUTY CLERK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
THOMAS E. PEREZ, Secretary of Labor,  \*
United States Department of Labor,  \*
  \*
     Plaintiff,  \*
  \*
     v.  \*
  \*
FIRST BANKERS TRUST  \*
SERVICES, INC., TOMMY A. HARMON, \*
FREDERICK FRITZ, SONNAX  \*
INDUSTRIES, INC., and the SONNAX  \*
INDUSTRIES, INC. EMPLOYEE STOCK \*
OWNERSHIP PLAN,  \*
  \*
     Defendants.  \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CIVIL ACTION NO.

5:16-cv-328

## COMPLAINT

Plaintiff, Thomas E. Perez, Secretary of Labor, United States Department of

Labor (the "Secretary"), alleges:

1. This action arises under Title I of the Employee Retirement Income Security

Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. §§ 1001 *et seq.*, as amended, and is

brought by the Secretary to enjoin acts and practices which violate the provisions of Title

I of ERISA and to obtain appropriate relief in order to redress violations and enforce the

provisions of that Title pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2)

and (5).

2. The ERISA violations alleged herein arise from Defendant First Bankers Trust

Services, Inc.'s ("First Bankers") failure to protect the Sonnax Industries, Inc. Employee

Stock Ownership Plan's (the "ESOP" or "Plan") interests in connection with the ESOP's

purchase of Defendant Sonnax Industries, Inc. ("Sonnax" or the "Company") stock from

Defendant Tommy A. Harmon ("Harmon") and Defendant Frederick Fritz ("Fritz"), the Company's owners. Relying on a flawed valuation of the stock, and without prudently investigating the merits of the transaction, First Bankers, with the aid and knowledge of Sonnax, Harmon and Fritz, caused the ESOP to purchase highly leveraged company stock from Harmon and Fritz, both parties in interest, for far more than fair market value. As a result, First Bankers, Sonnax, Harmon and Fritz violated ERISA's prohibited transactions and fiduciary duties provisions.

## JURISDICTION AND VENUE

3.   The Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.   Venue with respect to this action lies in the District of Vermont pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), where the Plan was administered, where the breaches alleged herein took place, and where certain of the Defendants reside.

## THE PARTIES

5.   The Plan is sponsored by Sonnax. The purpose of the Plan is to primarily or exclusively purchase Company stock for the exclusive benefit of participants (eligible Sonnax employees) and their beneficiaries. The ESOP is administered in Bellows Falls, Vermont, where Sonnax is headquartered. The ESOP is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2) and is subject to coverage under the Act pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a). The ESOP is named in this Complaint solely for the purpose of ensuring complete relief among the parties pursuant to Rule 19 of the Federal Rules of Civil Procedure.

6.  At all relevant times, First Bankers was the Trustee and a Named Fiduciary of the ESOP (the "Trustee").  According to the trust agreement effective October 1, 2010 that was entered into between Sonnax and First Bankers (the "Trust Agreement"), and notwithstanding certain provisions of the ESOP's governing Plan Document (the "Plan Document"), First Bankers had "full and complete investment authority and responsibility with respect to the purchase, retention, sale and pledge of Company Stock," "[a]ll purchases and sales [of which] shall be made at no more than fair market value as determined in good faith by the Trustee."  In its capacity as Trustee, First Bankers exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan, rendering it a fiduciary of the ESOP pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

7.  Sonnax is a Vermont corporation which supplies proprietary automotive aftermarket drivetrain products.  At all relevant times, pursuant to the Plan Document, Sonnax was the Plan Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a Named Fiduciary of the ESOP.  According to the Plan Document, as Plan Administrator, Sonnax had the "exclusive discretionary responsibility and authority to control and manage the operation and administration of the Plan." Additionally, Sonnax, through its board of directors (the "Board"), had the authority to and did appoint First Bankers as Trustee, and had the authority to remove First Bankers. Accordingly, Sonnax had the fiduciary duty to monitor First Bankers' performance of its fiduciary obligations in connection with the decision to acquire the Company on behalf of

the ESOP (the "2011 Transaction"). For these reasons, Sonnax exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan, rendering it a fiduciary of the ESOP pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

8.   At all relevant times, Harmon was Sonnax's President and Chief Executive Officer and one of its three Board members. Until Harmon sold his stock to the ESOP in the 2011 Transaction, Harmon owned 60% of the Company. Harmon, on behalf of the Company, along with Fritz, appointed First Bankers as Trustee and had the authority to remove First Bankers. As one of the individuals involved in appointing First Bankers as Trustee, Harmon had the fiduciary duty to monitor First Bankers' performance of its fiduciary obligations in connection with the 2011 Transaction. Additionally, as a Board member with control over the Company, Harmon acted as Plan Administrator with "exclusive discretionary responsibility and authority to control and manage the operation and administration of the Plan." Harmon also signed the Plan's 2010 annual reporting filing required under ERISA (Form 5500) as Plan Administrator. For these reasons, Harmon exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan, rendering him a fiduciary of the ESOP pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

9.   At all relevant times, Fritz was one of the Company's three Board members, and, until he sold his stock to the ESOP, owned 40% of the Company (half of which he

4

owned through a trust). Fritz, a Board member with substantial control over the Company, along with Harmon, appointed First Bankers as Trustee and had the authority to remove First Bankers. As one of the individuals involved in appointing First Bankers as Trustee, Fritz had the fiduciary duty to monitor First Bankers' performance of its fiduciary obligations in connection with the 2011 Transaction. Additionally, as a Board member with control over the Company, Fritz acted as Plan Administrator with "exclusive discretionary responsibility and authority to control and manage the operation and administration of the Plan." For these reasons, Fritz exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan, rendering him a fiduciary of the ESOP pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

10. Sonnax was a party in interest with respect to the 2011 Transaction pursuant to ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C), based on its status as a fiduciary and employer. Harmon was a party in interest to the 2011 Transaction pursuant to ERISA §§ 3(14)(A), (C), (E) and (H), 29 U.S.C. §§ 1002(14)(A), (C), (E) and (H), based on his status as a fiduciary, employer, owner, employee, officer, director and shareholder of Sonnax. Fritz was a party in interest to the 2011 Transaction pursuant to ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H), based on his status as a fiduciary, owner, director and shareholder of Sonnax. First Bankers was a party in interest to the 2011 Transaction pursuant to ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), based on its status as a fiduciary.

## FACTUAL ALLEGATIONS

### CHRONOLOGY OF EVENTS

11. In late 2009 or early 2010, Harmon and Fritz decided to explore selling their combined 100% ownership stake in Sonnax. They initially tried to sell the Company to strategic buyers or private equity. However, they received little interest, and the few initial indications of interest they did receive set out prices below the value Harmon and Fritz believed Sonnax to be worth. Harmon and Fritz eventually decided to explore the possibility of selling to an ESOP. In or around August 2010, Harmon contacted his outside counsel who referred him to Steiker, Fischer, Edwards & Greenapple, P.C. ("Steiker"), a law firm specializing in ESOPs. Steiker recommended bringing its affiliated firm, SES Capital Advisors, Inc., onboard as a financial advisor to Harmon and Fritz. Harmon and Fritz agreed, and hired SES and Steiker (collectively, "SES") as its financial and legal advisor.

12. Harmon and Fritz estimated the equity value of the Company to be in the range of $48 to $60 million. Privately, SES expressed misgivings about this range. In an internal email in September 2010, SES stated "there is a lot of risk attached to [Sonnax] achieving its projections." SES concluded that Sonnax was likely worth about $40 million or $44 million, depending on whether two affiliated real estate LLCs (the "LLCs") were included in the deal. Based on internal discussions, SES advised Harmon and Fritz that a $40 to $42 million price range (excluding the LLCs) was "highly likely," a $42 to $48 million was "somewhat likely," and anything much above $50 million would subject Harmon and Fritz to liability as "ERISA fiduciaries."

13. Harmon, Fritz and SES wanted to finalize the deal by the end of calendar year 2010 and worked quickly to hire a trustee to negotiate on behalf of the ESOP. SES and First Bankers frequently worked together. On October 4, 2010, SES contacted First Bankers about becoming the ESOP trustee. SES informed First Bankers that Harmon and Fritz were seeking a price in the range of $50 to $55 million, and that they intended to use Stout, Risius, Ross ("SRR") to value the Company on behalf of the trustee. SES cautioned First Bankers that they were in a "horse race with private equity," so they would need to work quickly to get a deal done. First Bankers expressed interest and agreed to use SRR and work quickly. Harmon and Fritz selected First Bankers as Trustee.

14. On October 12, 2010, SES made the following offer to First Bankers on behalf of Harmon and Fritz: the Company would (a) purchase (or "redeem") Harmon's and Fritz's stock for $55 million (the "Redemption Transaction"), financed by a bank loan and promissory notes to Harmon and Fritz; and (b) concurrently issue new shares, 100% of which would be sold to the ESOP for $10 million (the "ESOP Purchase") (collectively, "the 2011 Transaction").

15. SES followed-up with SRR a few weeks later to inform it that Harmon and Fritz would need a counteroffer soon. First Bankers quickly arranged a meeting with SRR, and First Bankers' outside counsel, Katten Muchin Rosenman LLP ("Katten") for November 2, 2010. In preparation therefor, SRR provided First Bankers a cursory valuation of the Company (the "Initial Guidance").

16. Only a small subset of First Bankers' committee designated to approve the Sonnax deal actually attended the November 2 meeting. At the meeting, SRR observed

that Harmon's and Fritz's $55 million asking price was based on financials that did not account for rent liability to the LLCs, which LLCs the parties had decided not to include in the deal. First Bankers made a counteroffer of $49 million, which was determined in part by simply factoring the LLC rent liability into Harmon's and Fritz's asking price. Harmon and Fritz quickly accepted.

17. SES had suggested that Harmon and Fritz hold off on formally retaining First Bankers until after they received a counteroffer from First Bankers and SRR. On information and belief, Sonnax formally retained First Bankers as Trustee only after the transaction price was set at $49 million pursuant to an engagement letter signed by Harmon with an effective date of November 1, 2010. The engagement letter set forth the duties of First Bankers as Trustee. Among other things, First Bankers "ha[d] complete discretionary responsibility with respect to the Transaction . . . [and] for the acquisition of employer securities for the Plan." The engagement letter set First Bankers' compensation for the 2011 Transaction at a one-time fee of $30,000.

18. Negotiations over the subsequent few months largely concerned other terms of the deal, such as Harmon's employment agreement. If First Bankers or its team questioned anything, SES was prepared to push back. For instance, on November 11, 2010, First Bankers' attorney, Katten, contacted SES to inquire about tax issues on a separate deal the two were negotiating. SES responded that "[New York City] tax lawyers [such as Katten] have a unique habit of creating issues where none exist . . . . [I]f there is a real[] problem with your tax colleague on any of this, we are really going to have an issue not only for this deal but for future deals." In subsequent internal emails,

SES stated that they would "need to figure out [] whether to pull Katten out of the Sonnax deal."

19. On December 22, 2010, SRR provided a draft valuation report (the "Draft Report") to First Bankers that included new analysis and significantly greater detail than it had provided in the Initial Guidance. First Bankers left the transaction price unchanged, except for a $200,000 reduction to $48.8 million based on a recent distribution to Harmon and Fritz. First Bankers informed SES that it was giving final approval to the deal.

20. On December 27, 2010, Sonnax formally adopted the ESOP with an effective date of October 1, 2010.

21. On January 3, 2011, SRR provided First Bankers with a fairness opinion which concluded the $48.8 million Redemption Transaction price and the $10 million ESOP Purchase price were fair. On that same day, the Company redeemed 100% of its outstanding shares from Harmon and Fritz for $48.8 million, and sold 100% of newly issued shares to the ESOP for $10 million.

22. The Company financed the Redemption Transaction through $15 million in cash provided pursuant to a bank loan, and $33.8 million in subordinated promissory notes to Harmon and Fritz. As part of the Redemption Transaction, Harmon and Fritz also obtained stock appreciation rights and warrants (described below). The Plan financed the ESOP Purchase through a $10 million promissory note financed and backed by the Company.

23. On January 10, 2011 – a full week after the 2011 Transaction – SRR completed its final valuation report of the Company (the "Final Report"). The Final

Report set forth a new methodology for valuing the Company and different figures than those in either the Draft Report or Initial Guidance. The $48.8 million Redemption Transaction and $10 million ESOP Purchase prices, however, remained the same.

24. For work performed subsequent to the 2011 Transaction, First Bankers received, among other compensation, an ongoing asset-based fee based on a percentage of the assets held by the ESOP.

<u>FAILURE TO OBTAIN ADEQUATE</u>
<u>CONSIDERATION FOR THE ESOP'S PURCHASE</u>

25. The 2011 Transaction was approved on behalf of the ESOP by First Bankers, who was hired as Trustee solely to represent the interests of the ESOP and its participants and beneficiaries.

26. First Bankers had a duty to make certain that its reliance on SRR's advice was reasonably justified under the circumstances. First Bankers was obligated to read SRR's valuation reports, understand the reports, and identify, question and test SRR's underlying assumptions. In addition, First Bankers was obligated to verify the accuracy of the data SRR relied on, and to ensure that SRR's conclusions were both internally consistent and consistent with the data provided. First Bankers failed to comply with these duties under ERISA for, *inter alia*, the following reasons.

27. SRR valued the Company using two methodologies standard in the appraisal industry: the Discounted Cash Flow ("DCF") and the Guideline Company methods. The DCF method has three primary components: (1) cash flow projections; (2) a discount rate; and (3) terminal value. Terminal value refers to the cash flow a company is expected to generate in perpetuity expressed as a present value. A company's terminal value has an implicit rate of growth. That is, the present value of the company's cash

flow in perpetuity factors in a rate at which the company and its cash flow will grow. A common terminal growth rate is between 2 and 4%.

28. SRR's implied terminal growth rate was over 8%. It is highly unlikely that a company could grow in perpetuity at a rate that is so far beyond a common terminal growth rate, and well beyond even the historic U.S. gross domestic product growth rate. By contrast, for its valuation, SES used a growth rate of 4%. Accordingly, First Bankers knew or should have known that the terminal value on which it based its price was fundamentally flawed. On information and belief, however, First Bankers never questioned this assumption. In so doing, First Bankers caused the ESOP to overpay for Sonnax stock by millions of dollars.

29. First Bankers further erred in relying on SRR's valuation because it adopted aggressive growth projections that were inconsistent with Sonnax's historical performance. Like terminal value, growth projections are another key component in the valuation of a company. SRR obtained five years of growth projections from Sonnax, Harmon, Fritz and SES (as it did much of the other underlying financial information) and simply plugged the projections into its valuation model. These projections, however, are flawed for a number of reasons. The projections forecasted robust and steadily increasing revenue and margin growth for Sonnax. Sonnax based these projections on five historical years surveyed. However, each of the five years forecasted was higher than Sonnax's best historical year, which itself was significantly higher than any of the other four historical years. And the steadily rising growth assumed in the projections is undermined by the erratic and often declining growth in the five historical years surveyed. In fact, SES itself privately noted that "there is a lot of risk attached to [Sonnax] achieving its

projections." Like SES, First Bankers knew or should have known that the projections were overly aggressive and flawed. Instead, it relied on the flawed projection to determine the transaction price, and thereby caused the ESOP to overpay by, on information and belief, millions of dollars.

30. As part of the 2011 Transaction, Harmon, Fritz and key management personnel received a substantial number of warrants (which grant the right to purchase Sonnax shares in the future at a set price) and stock appreciation rights ("SARs"). When exercised or earned, warrants and SARs dilute current ownership of a company. This dilutive effect must be taken into account when determining the fair market value of a company. SRR never properly accounted for the dilutive effect the warrants and SARs provided to Harmon, Fritz and other management as part of the 2011 Transaction would have on the ESOP's ownership of the Company. For instance, SRR's Final Report only accounts for the impact of the bank loan and promissory notes on Sonnax's fair market value. It makes no mention, however, of the impact of the warrants and SARs. In so doing, SRR's valuation further inflated the value of Sonnax stock and caused additional damages to the ESOP.

31. In light of the fundamental valuation flaws and woefully deficient investigation and negotiation described above, First Bankers' reliance on SRR's valuation was unreasonable and its representation of the ESOP inadequate. As a result, First Bankers caused the ESOP to significantly overpay by millions of dollars for highly leveraged Sonnax stock, thereby failing to loyally and prudently represent the interests of the ESOP and its participants and beneficiaries.

32. For their part, Sonnax, Harmon and Fritz were the Plan Administrators who also had selected and could remove First Bankers as Trustee. In this capacity, Sonnax, Harmon and Fritz were obligated to monitor the activities of First Bankers, to remove First Bankers as Trustee if they knew, or should have known, that First Bankers was not acting in compliance with its fiduciary duties under ERISA, and to otherwise comply with their own ERISA fiduciary duties.

33. In light of the fundamental valuation flaws and woefully deficient investigation and negotiation described above, Sonnax, Harmon and Fritz knew or should have known that the work performed by their co-fiduciary First Bankers was flawed, and they knowingly participated in such work. For instance, Sonnax, Harmon and Fritz knew or should have known First Bankers was relying on aggressive and overly optimistic projections which they had provided and even their own advisors acknowledged were unrealistic. Sonnax, Harmon and Fritz also knew or should have known about, and indeed participated in, First Bankers' improper investigation and negotiation which, *inter alia*, were done in haste and not in good faith, using the appraiser that SES desired, and without meaningfully reducing Harmon's and Fritz's inflated asking price, which Harmon and Fritz knew or should have known was too high. In so doing, Sonnax, Harmon and Fritz failed to ensure that First Bankers fulfilled its fiduciary duties, failed to remove First Bankers as Trustee, failed to prevent the ESOP's purchase of shares at a price they knew, or should have known, was inflated, participated knowingly in First Bankers' fiduciary breaches, and otherwise failed to comply with their own fiduciary duties to act prudently and solely in the interests of the ESOP participants and beneficiaries.

13

INDEMNIFICATION AGREEMENTS

34. Both the Plan Document and Trust Agreement provide indemnification to
First Bankers and otherwise limit its liability for ERISA fiduciary breaches.  The Plan
Document and Trust Agreement provide that First Bankers will be indemnified for any
actions or omissions unless resulting "primarily and directly from bad faith, fraud, willful
or wanton misconduct or action in a manner that is a material and substantial departure
from prevailing standards of ordinary care in similar circumstances."  The Plan
Document and Trust Agreement further provide that Sonnax will indemnify First Bankers
for all expenses, adjudications, and reasonable settlement amounts incurred in the defense
of any lawsuit or action connected to its work as Trustee for the Plan, unless such
expenses result "primarily and directly from bad faith, fraud or willful and wanton
misconduct or action in a manner that is a material and substantial departure from
prevailing standards of ordinary care in similar circumstances."  The engagement letter
between First Bankers and Sonnax similarly indemnifies First Bankers, except in the
event First Bankers is found by a court to have acted in negligence or committed willful
misconduct.

35. Pursuant to these terms, Sonnax, which is 100% owned by the ESOP, would
have to pay First Bankers' costs, expenses, judgment, or any settlement amount in
connection with the ERISA violations alleged herein against First Bankers, so long as
First Bankers did not engage in bad faith, fraud, willful or wanton misconduct or action
in a manner that is a material and substantial departure from prevailing standards of
ordinary care in similar circumstances.

## VIOLATIONS

### FIRST CAUSE OF ACTION

ERISA §§ 404(a)(1)(A), (B) and (D)

36. The Secretary adopts and incorporates by reference the averments and allegations of Paragraphs 1 through 35, inclusive.

37. In connection with the 2011 Transaction, First Bankers breached its fiduciary duties to act solely in the interest of the ESOP participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), by, *inter alia*:

    a.  failing to conduct negotiations and perform an investigation of the Company's value in a good faith manner, including rushing through the negotiations and investigation to meet the time frame and price required by sellers Harmon and Fritz, using the appraiser that the sellers' financial advisor SES desired, failing to have a meaningful valuation performed before making a counteroffer, failing to adequately review and question SRR's shifting and inconsistent valuation reports, and only obtaining the Final Report after the 2011 Transaction had already been executed;

    b.  failing to understand, question or correct SRR's flawed valuation assumptions and conclusions, including a grossly overstated terminal value, aggressive and unrealistic growth projections, and an improper

omission of the dilutive effect of the warrants and SARs in the Final Report;

c.  failing to independently determine fair market value for the Company;

d.  approving the 2011 Transaction despite the fact that First Bankers knew or should have known that the valuation on which it relied was fundamentally flawed and inflated the price of Sonnax stock; and

e.  causing the ESOP to pay significantly more than fair market value for highly leveraged Sonnax stock and otherwise failing to obtain adequate consideration for the $10 million it caused the ESOP to pay for the Company.  Given the fact that the Redemption Transaction price was so significantly overvalued, the ESOP Purchase price was far more than adequate consideration.

38. In connection with the 2011 Transaction, First Bankers violated its fiduciary duty to exercise its responsibilities solely in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with Title I of ERISA in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by, *inter alia*, failing to purchase shares of the Company "at fair market value as determined in good faith by the Trustee," as required by the Trust Agreement, and by failing in its duties of loyalty and prudence, as required by the Plan Document.

39. As a result of the foregoing imprudent and disloyal acts and omissions, First Bankers caused losses to the Plan for which it is jointly, severally and personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

40. Sonnax, Harmon and Fritz, as the Plan Administrators who selected and could remove First Bankers as Trustee, failed to monitor or remove First Bankers, and instead participated in and contributed to First Bankers' breaches of its fiduciary duties, in violation of Sonnax, Harmon and Fritz's own duties of loyalty and prudence to the ESOP pursuant to ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).  As a result of these imprudent and disloyal acts and omissions, Sonnax, Harmon and Fritz caused losses to the Plan for which, they are jointly, severally and personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

41. As co-fiduciaries to the Plan and knowing participants, Sonnax, Harmon and Fritz are liable for the above described fiduciary breaches committed by their co-fiduciary, First Bankers.  Sonnax, Harmon and Fritz (a) participated knowingly in First Bankers' breaches of fiduciary duty; (b) enabled First Bankers to commit breaches of its fiduciary duty by failing to monitor First Bankers in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) (as described above); and (c) knew or should have known of First Bankers' breaches of fiduciary duty, but failed to make reasonable efforts under the circumstances to remedy those breaches.  Accordingly, Sonnax, Harmon and Fritz are each jointly, severally and personally liable for the losses caused to the ESOP by First Bankers pursuant to ERISA §§ 405(a)(1), (2) and (3), 502(a)(2) and (5), 29 U.S.C. §§ 1105(a)(1), (2), and (3), 1132(a)(2) and (5).

SECOND CAUSE OF ACTION

ERISA §§ 406(a)(1)(A) and (D)

42. The Secretary adopts and incorporates by reference the averments and allegations of Paragraphs 1 through 41, inclusive.

43. As a fiduciary to the ESOP, First Bankers was prohibited from causing the ESOP to engage in a transaction that constitutes the sale or exchange of property between the ESOP and a party in interest, and further was prohibited from causing the ESOP to engage in a transaction that constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the ESOP.  ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D).

44. As set forth above, Sonnax, Harmon and Fritz were parties in interest within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

45. By causing the ESOP to purchase Sonnax stock in connection with the 2011 Transaction, First Bankers:

    a.   caused the ESOP to engage in transactions that it knew or should have known constituted the direct or indirect sale or exchange, or leasing, of any property between the plan and parties in interest, in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A); and

    b.   caused the ESOP to engage in transactions that that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

46. As set forth above, Sonnax, Harmon and Fritz caused the ESOP to engage in a prohibited transaction, in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D).

47. ERISA § 408(e), 29 U.S.C. § 1108(e), provides an exemption to certain prohibited transaction requirements by allowing plans to purchase employer stock from

parties in interest as long as the price paid does not exceed adequate consideration. Adequate consideration is defined in ERISA § 3(18), 29 U.S.C. § 1002(18) as the "fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]."

48. Because the ESOP acquired stock at a price that far exceeded "adequate consideration," and First Bankers failed to conduct a prudent and good faith investigation of SRR's valuation and the circumstances prevailing at the time, the conditions of the exemptions under ERISA § 408, 29 U.S.C. § 1108, including ERISA § 408(e), 29 U.S.C. § 1108(e), have not been met.

49. As a result of the fiduciary breaches described above, First Bankers, Sonnax, Harmon and Fritz caused the ESOP to suffer financial losses for which they are personally, jointly and severally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

50. As co-fiduciaries to the Plan and knowing participants, Sonnax, Harmon and Fritz are liable for the above described fiduciary breaches committed by their co-fiduciary, First Bankers. Sonnax, Harmon and Fritz (a) participated knowingly in First Bankers' breaches of fiduciary duty; (b) enabled First Bankers to commit breaches of its fiduciary duty by failing to monitor First Bankers in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) (as described above); and (c) knew or should have known of First Bankers' breaches of fiduciary duty, but failed to make reasonable efforts under the circumstances to remedy those breaches. Accordingly, Sonnax, Harmon and Fritz are each jointly, severally and personally liable for the losses caused to the ESOP by First

Bankers pursuant to ERISA §§ 405(a)(1), (2) and (3), 502(a)(2) and (5), 29 U.S.C. §§
1105(a)(1), (2), and (3), 1132(a)(2) and (5).

THIRD CAUSE OF ACTION

ERISA § 410

51. The Secretary adopts and incorporates by reference the averments and
allegations of Paragraphs 1 through 50, inclusive.

52. ERISA § 410(a) provides that "any provision in an agreement or instrument
which purports to relieve a fiduciary from responsibility or liability for any responsibility,
obligation or duty under this part shall be void as against public policy."  ERISA §
410(a), 29 U.S.C. § 1110(a).  A fiduciary is impermissibly relieved of responsibility or
liability for its ERISA fiduciary duties when an ERISA plan itself bears some of the
burden of indemnifying the fiduciary for its breaches.  *See* 29 C.F.R. § 2509.75–4.

53. As set forth in Paragraphs 34 to 35 above, Sonnax's indemnification
agreements with First Bankers could require Sonnax, which is 100% owned by the
ESOP, to pay First Bankers' costs, expenses, judgment, and any settlement in connection
with First Bankers' ERISA violations relating to the 2011 Transaction, so long as First
Bankers did not engage in "bad faith, fraud, willful or wanton misconduct or action in a
manner that is a material and substantial departure from prevailing standards of ordinary
care in similar circumstances."  As the 100% shareholder of Sonnax, the ESOP could
incur significant indemnification obligations.

54. To the extent First Bankers is permitted to recover any money from Sonnax
pursuant to an indemnification agreement in connection with the violations alleged
herein, any such payments would be in violation of ERISA.

55. First Bankers should not gain any benefit at the expense of Sonnax, should First Bankers' actions on behalf of the ESOP be found in violation of ERISA pursuant to ERISA § 410(a), 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary prays that this Court:

1.   Order First Bankers, Sonnax, Harmon and Fritz to restore to the ESOP all losses incurred as a result of their fiduciary breaches, prohibited transactions and other violations for which they are liable, with appropriate lost earnings;

2.   Require First Bankers, Sonnax, Harmon and Fritz to unwind or otherwise correct the prohibited transactions, with appropriate lost earnings;

3.   Require First Bankers, Sonnax, Harmon and Fritz to disgorge any and all ESOP assets obtained by them and to disgorge any and all profits earned by them from those assets;

4.   Require Harmon (or any other named Defendant) to forfeit his ESOP account in order to offset all or part of any judgment ordered against him;

5.   Enjoin First Bankers, Sonnax, Harmon and Fritz from engaging in any further violations of Title I of ERISA;

6.   Enjoin First Bankers, Sonnax, Harmon and Fritz from serving as a fiduciary, trustee or service provider for any ERISA-covered plan;

7.   Enjoin First Bankers from receiving any benefits from its indemnification agreements with Sonnax that are in violation of ERISA;

8.   Award the Secretary the costs of this action; and

9.   Provide such other relief as is just and equitable.

Respectfully submitted,


M. Patricia Smith
Solicitor of Labor


Post Office Address:                    Michael D. Felsen
Office of the Solicitor                 Regional Solicitor
J.F.K. Federal Building
Room E-375                              Marjorie A. Butler
Boston, MA  02203                       ERISA Counsel
Tel. (617) 565-2500
Fax (617) 565-2142
                                        Nathan P. Goldstein
                                        Senior Trial Attorney

                                        Niamh E. Doherty
                                        Trial Attorney

                                        United States Department of Labor
                                        Attorneys for the Plaintiff


Date:  December 27, 2016